# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| **RACHEL BUTRIM**, individually as the surviving Spouse and as Personal Representative of the Estate of Paul Butrim<br>1 Get Around Drive<br>Colora, Maryland 21917<br><br>and<br><br>**PAISLEY BUTRIM**, individually as the Surviving Daughter of Paul Butrim<br>1 Get Around Drive<br>Colora, MD 21917<br><br>and<br><br>**LACEY MARINO**, as personal Representative of the Estate of Kelsey Sadler<br>1723 Castleton Road<br>Darlington, MD 21034<br><br>and<br><br>**BRANDON SADLER**, individually as the Surviving Spouse of Kelsey Sadler<br>513 E. Michaelsville Road<br>Perryman, MD 21130<br><br>and<br><br>**JERRY NORMAN**, individually as the Surviving Father of Kelsey Sadler<br>1348 Knopp Road, Jarrettsville, MD 21084<br><br>and<br><br>**GLORIA LACAYO**, individually as the Surviving Mother, and as Personal Representative of the Estate of Kenneth Lacayo<br>3900 Bel Air Road, Condo #5<br>Silver Spring, MD 21906<br><br>and | **COMPLAINT**<br><br>**JURY DEMANDED**<br><br>**Civil No.** |

**JOHN MCMASTER**, Individually
1926 Edgewood Road
Loch Raven, MD 21286

     *Plaintiffs*,

     v.

**MAYOR AND CITY COUNCIL
OF BALTIMORE**
250 City Hall, 100 N. Holiday Street
Baltimore, MD 21202

     SERVE ON:
     Ebony Thompson, Solicitor
     Baltimore City Law Dept.
     100 N. Holliday St., Room 250
     Baltimore, Maryland 21202

     *Defendant*.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Rachel Butrim, individually as the surviving spouse and as Personal Representative of the Estate of Paul Butrim, Paisley Butrim, individually as the surviving daughter of Paul Butrim, Lacey Marino, as Personal Representative of the Estate of Kelsey Sadler, Brandon Sadler, individually as the surviving spouse of Kelsey Sadler, Jerry Norman, individually as the surviving father of Kelsey Sadler, Gloria Lacayo, individually as surviving mother and as Personal Representative of the Estate Kenneth Lacayo, and John McMaster (collectively "Plaintiffs"), through their undersigned counsel, file this Complaint against the City of Baltimore (the "City"), and states in support:

<u>**INTRODUCTION**</u>

Baltimore City Firefighters, Paul Butrim, Kenneth Lacayo, and Kelsey Sadler were killed, and Firefighter John McMaster was severely and permanently injured, when a burning condemned rowhome at 205 South Stricker Street collapsed on them just minutes after they were ordered inside.  This tragedy was predictable, foreseeable, and so easily avoidable.  Yet, the City essentially guaranteed this tragic outcome through a series of egregious acts, over more than ten years, with conduct so pervasive as to form a policy, practice, and/or custom.

Beginning in 2010, the City promised firefighters including the Plaintiffs that it had established and maintained a program that would catalog, and mark structurally compromised condemned properties to ensure that firefighters would never be ordered inside and face the probable risk of death from a collapse.  This was a bald-faced lie.  Simultaneously, the City knew that certain condemned properties were at imminent risk of collapse, but instituted a policy not to demolish, mark, or track them because the City earmarked those properties to use as bargaining chips in an unlawful profit-sharing scheme designed to generate off-the-books revenue for certain City agencies and employees.

As described herein, the City's conduct went far beyond the ordinary governmental neglect that is sadly synonymous with Baltimore leadership.  It was an intentional and egregious pattern of conduct, committed over more than ten years, with such conscience-shocking deliberate indifference to the Plaintiffs' constitutional rights as to infer the City's intention to harm the Plaintiffs.

<u>**JURISDICTION AND VENUE**</u>

1.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the action involves questions under the United States Constitution.

2.      The Court has personal jurisdiction over the City because it is a citizen of Maryland.

3.      Venue is proper under 28 U.S.C. § 1391(b)(1) because all actions complained of herein occurred within this judicial district.

### PARTIES

4.      Plaintiff Rachel Butrim is the surviving spouse of Paul Butrim, the Personal Representative of the Estate of Paul Butrim, and a Maryland resident.  She sues individually, on behalf of the Estate of Paul Butrim, and as mother and next friend to Paisley Butrim, who is the surviving daughter of Paul Butrim.

5.      Plaintiff Lacey Marino is a surviving sibling of Kelsey Sadler, the Personal Representative of the Estate of Kelsey Sadler, and a Maryland resident.  She sues individually and on behalf of the Estate of Kelsey Sadler.

6.      Plaintiff Brandon Sadler, a Maryland resident, is the surviving spouse of Kelsey Sadler and sues individually.

7.      Plaintiff Jerry Norman, a Maryland resident, is the father of Kelsey Sadler, and he sues individually.

8.      Plaintiff Gloria Lacayo is the mother of Kenneth Lacayo, the Personal Representative of the Estate of Kenneth Lacayo, and a Maryland resident.  She sues individually and on behalf of the Estate of Kenneth Lacayo.

9.      Plaintiff John McMaster is a Maryland resident, and he sues individually.

10.     Defendant City of Baltimore (the "City") is a body politic and corporate body that may sue and be sued in the name of the Mayor and City Council of Baltimore.

## FACTS

11.     Early in the morning on January 24, 2022, Baltimore City firefighters responded to a fire at 205 South Stricker Street, a condemned row house in the Mount Clare neighborhood. They arrived to find the fire in an advanced stage of fire growth.  No markings or placards were placed outside indicating that the home was compromised.  So, six firefighters were ordered into the burning structure.  Moments later, the interior of the house pancaked and collapsed.  The commander immediately called Mayday, and a rescue team quickly removed two firefighters from the blaze.  The other four firefighters were not as fortunate—Paul Butrim, Kenneth Lacayo, and Kelsey Sadler died, and John McMaster sustained serious permanent injuries (the "Incident").

12.     This was no accident.  The City essentially guaranteed this outcome through its pattern of arbitrary and egregious conduct that preceded this tragedy by more than a decade.  Over that time, the City deliberately, recklessly, and arbitrarily violated constitutional rights and acted with the requisite intent to harm its firefighters, including the Plaintiffs, with conscience-shocking conduct.

13.     When the Plaintiffs entered 205 Stricker Street in January 2022, they had no idea what the City knew and failed to tell them about a property that it controlled at all relevant times: the property had been vacant for fourteen (14) years, two fires had damaged the home in 2015 and 2016, causing a partial collapse of the interior, trapping and injuring three other firefighters, and leaving the property exposed to the elements and structurally unsound.  Nor did the Plaintiffs know that the City had condemned 205 Stricker Street in 2015 after determining that the property was so severely compromised and at risk of collapse.  The Plaintiffs certainly had no idea that, on information and belief, the City included 205 Stricker Street in a pay-to-play and profit-sharing

scheme that required the City to leave the property undemolished (and ensured it would stay that way) despite its clear and present danger.

14.     205 Stricker Street is in the Mount Clare neighborhood of southwest Baltimore, which is serviced by the Third Battalion of the Baltimore Fire Department ("BFD").  By way of background, Mount Clare is the most impoverished neighborhood in Baltimore, with the majority of its primarily African American residents living below the poverty line.  More than half of the homes in Mount Clare are vacant (unoccupied), many of which have been condemned, meaning these homes can never be fit for habitation or rehabilitation.  Mount Clare properties catch fire more often than nearly every neighborhood in Baltimore, and vacant homes in Mount Clare burn at twice the national average.

15.     Many of the vacant homes in Mount Clare have caught fire several times, with some experiencing three or four different fires with varying degrees of interior collapse.  205 Stricker Street was no exception, having caught fire at least twice before the Incident.  In 2015, three Baltimore firefighters were injured when the second floor collapsed and trapped them as they fought a fire from the inside.  The City condemned 205 Stricker Street after inspections revealed that the 2015 fire left it roofless, exposed to the elements, and at serious and imminent risk of collapse.  In 2016, the home burned again and sustained further significant structural damage.  No person should have been inside 205 Stricker Street after 2016.

16.     No meaningful development has occurred in Mount Clare for decades because the likelihood of a return on any investment is non-existent—the level of blight is simply too high. The City has long ignored Mount Clare because of this sad reality and has instead focused on other (non-minority) Baltimore neighborhoods where it believes it can attract private investors.

17.     Although vacant homes are not unique to Mount Clare, the City's approach there certainly is.  Elsewhere in Baltimore, the City has attempted to combat the vacant home crisis and the myriad health and safety risks caused by the blight.  These efforts include condemning and demolishing unsafe structures, posting warning signs on structurally compromised buildings, incentivizing private investment, and capital improvement projects through partnerships with private industry.

18.     Thus, the City has made a business decision to focus its efforts on Baltimore neighborhoods that offer a better potential return on investment, rather than areas that, in the City's view, are blighted beyond repair.  The City has chosen to focus its resources, which include federal funds, on more affluent areas with active voting blocs, large tax (and political) contributions, and largely white populations.  This has caused property values to diminish and has rendered entire zip codes wastelands.

19.     Similarly, the City diligently enforces the housing code in neighborhoods where a prospect of investment exists but refuses even the most basic code enforcement in neighborhoods like Mount Clare.  However, in so doing, the City has abdicated its primary duty to govern for the common good of all its citizens, deciding instead to pick winners and losers for the good of a few and the detriment of most.

20.     A quick glance around Baltimore illustrates this point.  Between 2015 and 2021, the City invested heavily (and offered significant tax breaks to private developers) in Fells Point, Federal Hill, Seton Hill, and Locust Point.  As a result, the number of vacant properties decreased

in these neighborhoods.[1]  Over the same period, the City invested nothing in its most blighted neighborhoods including Mount Clare, and the number of vacant properties increased.

21.     To illustrate: of the 928 houses in Mount Clare, 303 are vacant [nearly thirty-three percent (33%)].  Of the 1,283 houses in Carrollton Ridge, 475 are vacant [thirty-seven percent (37%)].  Of the 670 houses in Mosher, 246 are vacant [almost thirty-seven percent (37%)].  Of the 1,006 houses in Parkview, 317 are vacant [thirty-one and a half percent (31.5%)].   Of the 724 houses in Druid Heights, 239 are vacant [thirty-three percent (33%)].   Of the 1,998 houses in Oliver, 509 are vacant [over twenty-five percent (25%)].  Of the 1,631 houses in McElderry Park, 447 are vacant [over twenty five percent (25%)].  By contrast, in Mt. Washington, Waverly, and Federal Hill, where most of the population is white, the vacancy rate is collectively under five percent (5%).

22.     The concentration of vacant homes in certain areas can be directly traced to Baltimore's adoption of the nation's first racially segregated housing ordinance in 1911 and the subsequent unlawful redlining that followed formal desegregation.  These policies created inner-city ghettos lacking in services, resources, and investment, particularly in neighborhoods inhabited mostly by people of color, including the area where Stricker Street is located.  The City has continuously neglected these neighborhoods while pouring millions into more affluent, predominantly white areas, often refusing to enforce the law in neglected areas.  Over time, this lack of care, attention, and resources has led to a skyrocketing number of vacant homes in these neighborhoods.

---

[1] Notably, the City's tax incentive program, which benefits only the wealthiest neighborhoods, already costs Baltimoreans more than $125 million in lost revenue annually, increasing to 9 percent of the City's total revenue by 2031.

23.     Today, residents of historically redlined neighborhoods in Baltimore have shorter life expectancies, are disproportionately impoverished, experience higher rates of violent crime, suffer from chronic illnesses at higher rates, and contend with markedly higher numbers of vacant and condemned homes compared to residents of other neighborhoods.  For instance, in Mount Clare, Carrollton Ridge, Mosher, Parkview, Druid Heights, Oliver, McElderry Park, and other similar neighborhoods, vacancy rates range from 25% to nearly 40%.  In contrast, neighborhoods with predominantly white populations like Mt. Washington, Waverly, and Federal Hill have vacancy rates collectively under 5%.

24.     The City's neglect has caused a vacant home crisis with estimates ranging from 15,000 to 20,000 vacant and/or condemned properties in Baltimore.

25.     Troublingly, Baltimore still suffers from the primary issues that prompted Congress to create the Fire Prevention and Control Act of 1974—lack of code enforcement and inadequate training.  Congress found these issues paramount in reducing hazards for firefighters and residents, minimizing fire deaths and injuries, reducing property loss, and improving a community's economic structure.

26.     The U.S. Fire Administration ("USFA") has long considered vacant structures to be "extremely treacherous to firefighters."  Regulatory agencies such as the Occupational Safety and Health Administration ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the USFA, and the National Fire Protection Association ("NFPA") instruct fire departments to take defensive exterior positions when fighting fires in structurally compromised buildings, avoiding entry due to a high likelihood of collapse. The Federal Emergency Management Agency ("FEMA") also sets standards for evaluating and marking vacant buildings, which grant recipients, including the City, must comply with as a condition of funding.

27.     Because of the probability of injury or death in structurally compromised building fires, federal agencies also instruct fire departments to implement a marking system to warn unsuspecting firefighters not to enter such properties.  Such properties should also be stored in a database and relayed to responding units during dispatch.  According to the USFA, marking structurally compromised condemned properties is the most effective tool to prevent firefighter deaths.  NIOSH has concluded that almost every firefighter death caused by an unsafe vacant property collapse could have been avoided with an adequate marking system.

28.     On information and belief, in response to the "serious known threats associated with unsafe vacant buildings," and to comply with federal regulators and industry standards, the City, in 2010, implemented a program called Code X-Ray, which ensured that firefighters would never be ordered into a structurally unsafe condemned property—the risk of collapse and death was simply too high.  Under the Code X-Ray program, the City marked structurally unsafe buildings with reflective placards or a painted red "X" warning firefighters not to enter.  These rudimentary, but life-saving markings were cheap, yet effective, tools to protect unsuspecting firefighters from the risk of collapse because the firefighters could not appreciate that danger without the warnings.

29.     On information and belief, the City also promised its firefighters, including Plaintiffs, to maintain a database of all unsafe condemned structures under Code X-Ray, syncing it to the computer-aided fire dispatch system ("CAD").  The CAD would warn responding units and provide specific property details to guide risk assessment and firefighting techniques.  The database and warning system was meant to act as a failsafe if a structurally compromised building was not marked with a Code X-Ray placard or painted "X."

30.     On information and belief, the City specifically implemented the Code X-Ray program to mitigate the unreasonable risk of death to firefighters posed by structurally unsafe condemned homes, but also to comply with new OSHA and USFA standards after a slew of firefighter casualties in condemned properties, to comply with its duties under various federal grants, and to comply with its obligations under federal law.  On information and belief, the Code X-Ray program (or a functionally equivalent marking system) was also necessary for the City to secure and maintain grants for municipal services and capital improvement projects, as new federal funding was increasingly conditioned on adequate safety and mitigation strategies for vacant and condemned properties.

31.     The Code X-Ray program was a natural extension of the City's existing code enforcement obligations, which required the City to routinely inspect all vacant homes in Baltimore for habitability and safety and to catalog the unsafe properties in a database.  One of the goals of Code X-Ray was to integrate the City's extensive vacant property database with the CAD system so that the detailed code enforcement data from the City could be used to track fires in vacant homes, plot and mark structurally unsafe homes, and warn firefighters not to enter and only take defensive positions on the exterior.

32.     However, on information and belief, shortly after starting Code X-Ray, the City either discontinued the program entirely or limited its application to a few select neighborhoods, believing it would attract grant funding and private investment.  However, the City deliberately withheld this information from its Third Battalion firefighters, including Plaintiffs, who (mistakenly) believed, based on the City's repeated promise, that they would never be sent into a structurally unsafe condemned building.

33.     Thus, on information and belief, at all relevant times, the City maintained a policy of knowingly and deliberately sending (unsuspecting) firefighters into structurally unsafe condemned buildings, while simultaneously telling the firefighters that the Code X-Ray program would prevent this exact risk.

34.     On information and belief, Baltimore firefighters including Plaintiffs relied on the City's repeated assurances, and therefore understood, as a material term of their municipal employment, that they would not be ordered into structurally unsafe condemned buildings.  In other words, Baltimore firefighters understood, based on the City's repeated, specific, and express representations, that injury or death from a condemned home collapse was not a risk inherent to their job.  If the Plaintiffs knew that the City had lied about the Code X-Ray program, then they would not have continued working for the City because they valued their lives and families more than their municipal jobs.

35.     Notably, the City faced significant staffing shortages at BFD for years before the Incident.  By late 2021, staffing was at a "critically low level," with over 200 first responder vacancies across BFD.  It is believed that the City lied about Code X-Ray to firefighters including Plaintiffs, *inter alia*, to prevent a mass exodus from BFD.  The City knew that no firefighter would willingly continue their employment if they knew they could be unknowingly sent into structurally compromised condemned homes.  So, the City lied.

36.     On information and belief, the City maintained this policy of deception for more than ten years before the Incident.  At least one other Baltimore firefighter was killed in 2014 and three others were injured in 2015 as a direct result of this unconstitutional City policy.

37.     On November 12, 2014, a Baltimore City fire lieutenant died after falling through a hole in the floor of a vacant row house.  NIOSH found numerous deficiencies in the City's vacant

structure firefighting protocols when it investigated the 2014 death and explicitly told the City to begin marking unsafe vacant properties to avoid another tragedy. NIOSH concluded: "If this hazard had been identified by a building marking program, a different outcome might have occurred."

38.     On information and belief, following the 2014 NIOSH report, the City conceded that it had failed to properly mark and/or catalogue structurally compromised buildings, and reassured firefighters including Plaintiffs that it would improve the Code X-Ray program based on the NIOSH findings. However, the City simply gave lip service to the NIOSH report; it never corrected the deficiencies, and it continued lying to firefighters including Plaintiffs about the existence of Code X-Ray, and, therefore, about the material terms of their employment.

39.     Between 2014 and 2018, OSHA, USFA, and NFPA each updated their standards and advised municipalities, including the City, to place exterior signs on structurally compromised properties warning firefighters not to enter. The risk of collapse resulting in firefighter injury or death was simply too high without a warning system.

40.     In 2015, OSHA released updated safety guidelines specifically addressing the "unexpected hazard" to firefighters posed by vacant and condemned structures. OSHA explained that proper signage on such structures is "critical" and is often the difference between life and death when fighting vacant home fires because signs tell otherwise unsuspecting firefighters not to enter. OSHA also reminded municipal officials that condemned buildings should have prominent and permanent signs warning emergency personnel not to enter.

41.     In 2018, USFA published updated standards for risk management practices, aiming to ensure that fire departments were "meeting applicable national firefighter health and safety standards." These standards reiterated OSHA and NFPA directives and advised that abandoned

properties, like 205 Stricker Street, have "no value that justifies the level of risk associated with an interior offensive operation." After the Incident, NIOSH found that the City violated numerous USFA standards and NFPA directives.

42.     Despite updated federal standards and NIOSH explicitly telling the City in 2014 to implement a competent marking program, it took another seven years, three more firefighter casualties, countless damage to real property, and several civilian deaths before the City addressed the issue.

43.     Here, the City created the danger and then intentionally exposed the Plaintiffs to that danger through a series of affirmative acts over many years according to a custom, policy, and/or practice. This City-created danger harmed the Plaintiffs. It was not a matter of *whether* what occurred in this case would happen, but *when*.

44.     On information and belief, the City has always known of the excessive risk that unmarked structurally unsafe condemned properties posed to its firefighters' health and safety; indeed, the City created that risk. The City intentionally disregarded the risk it created for years by lying and claiming that the Code X-Ray program mitigated the hazard. In so doing, the City caused the risk to become more serious and likely to injure or kill firefighters. Then, after duping its firefighters into continuing their employment on a false factual predicate, the City deliberately exposed those unsuspecting firefighters to the City-created risk, which by this point was a City-created death trap. The City's deliberate indifference to the death trap it created is egregious and shocks the conscience.

45.     Baltimore has an inglorious history of neglecting vacant properties in certain neighborhoods, which has caused significant damage to real property and has injured and killed many firefighters and Baltimore residents.

46.     In March 2016, Thomas Lemmon was killed when a vacant West Baltimore rowhome collapsed and crushed him while he sat in his parked car.  The City had condemned the house 9 years earlier but ignored repeated complaints from neighbors who advised that the house was leaning and appeared to be structurally compromised.

47.     Beginning in April 2019, the owners of 306 Stricker Street repeatedly told the City that the vacant house next to theirs (at 304 Stricker Street) was collapsing and damaging their property, including their young daughter's bedroom.  The City never responded, and eventually, a wall of the neighboring home collapsed, causing significant damage.

48.     In March 2021, the owners of 912 Poplar Grove Street lost everything when their house burned down in a fire that started in vacant condemned homes on the same block.  For years, neighbors complained to the City about this cluster of vacant homes, which brought drugs, violence, and general blight to this neighborhood, and which were supposed to have been demolished.  Yet, the City ignored these complaints and the conditions of the condemned homes for years and refused to demolish the vacant structures, which occurred on the same day but *after* the fire.

49.     In March 2023, a high-speed car chase by Baltimore Police ended with the suspect's vehicle crashing into a vacant building on North Avenue, which collapsed and killed an innocent bystander.  The structure had been condemned in 2017, but the City took no further action despite numerous complaints about its compromised condition.

50.     On September 24, 2023, Sebron Plante was paralyzed, and two other residents were injured when a vacant house on Mount Street collapsed on them.  The home had been vacant since 2007, was condemned in 2016, and previously caught fire and partially collapsed.  Yet, the City

ignored repeated complaints from neighbors who advised that the home appeared to be structurally compromised.

51.     Disturbingly, City inspectors visited these properties regularly, sometimes as frequently as every other month.  Moreover, in each of these examples, the City demolished the remains of the collapsed structure <u>immediately</u> after the incident, raising questions about why remedial measures were only taken *after* injuries or deaths occurred, despite knowing that these injuries and deaths would continue without more proactive intervention.

52.     The City's treatment of 205 Stricker Street followed the same pattern of neglect.  In October 2015, a serious fire at 205 Stricker Street caused a partial interior collapse, trapping and injuring three firefighters, and prompting a Mayday call.  The City condemned the property after the 2015 fire because the damage was so extensive that it left "the structure unsafe and uninhabitable."

53.     In March 2016, another fire at 205 Stricker Street destroyed what remained of the roof, leaving the house exposed to the elements.  Over the next five years, neighbors repeatedly complained to the City about the safety and structural integrity of 205 Stricker and the attached house at 203 Stricker Street, which the City condemned in 1997.  However, the City took no action to mitigate the risk.

54.     When the Plaintiffs arrived at 205 Stricker Street on January 24, 2022, there was no exterior sign or painted "X," and no information in the CAD system warning about the previous fires/collapse or that it was a structurally unsafe condemned property.  If the City had implemented its Code X-Ray program as promised or directed by federal regulators, the Plaintiffs would not have entered 205 Stricker Street and would, more likely than not, be alive today.

55.     The City's misconduct was detailed in the Board of Inquiry ("BOI") Line of Duty Death Report, which concluded, *inter alia*, "There was no program or policy in effect that addressed notification to [firefighters] of dwellings which were vacant and unsafe" and "The absence of critical building information and the lack of a visual cue on the building was detrimental to the outcome of this fire."

56.     The BOI thus confirmed that the City fabricated the existence and/or the implementation of the Code X-Ray program, purposely misleading firefighters including the Plaintiffs since at least 2010.

57.     On information and belief, prioritizing money over safety was one of the City's motivations for misleading firefighters about the existence and/or implementation of the Code X-Ray program.  Only the neighborhoods with a potential for tax revenue, were on the radar.  In 2022, when the City contemplated issuing bonds to fund vacant home demolitions, the matter was immediately dismissed for fear of lowering the City's bond risk rating to "non-investment grade." City firehouses were closed in blighted neighborhoods so that the "investment grade" areas could have multiple available fire apparatuses, and these units were not permitted to service the blighted areas of Baltimore, which created additional hazards from understaffed firehouses.

58.     On information and belief, public corruption is another reason the City maintained its policy of deceiving firefighters.  Baltimore has a long and inescapable history of public corruption, from embezzlement and bribery to quid-pro-quo/pay-for-play schemes and misappropriation of federal funds.  Since 2010, two mayors, two police chiefs, a City delegate, the Baltimore City State's Attorney, countless Baltimore Police officers, and 345 municipal workers have been federally convicted.  Many other corrupt City officials have evaded criminal penalties, often allowed to retire early or resign quietly.  Baltimore's corruption is systemic.

17

59.     Today, Baltimore is characterized by its extensive list of convicted public officials, decaying infrastructure, record homicides, failing schools, economic disparity along racial lines, political patronage, misappropriation, and miles of vacant and condemned homes resembling a third-world war zone.  Institutionalized corruption has taken hold, manifesting in broad patterns of misconduct ingrained in the culture, policies, and operations of the City and its agencies.  Years of mismanagement and inadequate oversight have caused many Baltimore agencies to, themselves, become corrupt.

60.     A 2023 report from the Baltimore City Office of the Inspector General ("OIG") illustrates how institutionalized corruption operates.  OIG found that the City Department of Housing and Community Development ("DHCD"), which is the City agency responsible for, *inter alia*, managing vacant properties in Baltimore, had no policy for when building inspectors were offered bribes on the job.  According to OIG, "There was almost a culture that it was acceptable to take money from contractors if it was under a certain amount."  Despite the legal ramifications, DHCD supervisors admitted that inspectors were allowed to accept monetary gifts from contractors under "an allowable dollar amount," thus admitting that DHCD effectively sanctioned bribery of housing inspectors.  Moreover, OIG found that DHCD lacked explicit procedures governing all aspects of inspections and citations of building violations.

61.     On information and belief, DHCD's formal policy of allowing bribes or monetary "gifts" from contractors on the job did not emerge overnight.  DHCD has been plagued by systemic corruption since at least 2010.  This corruption includes misuse of funds, contracting irregularities, bid-rigging, kickbacks, ethical violations, nepotism, conflicts of interest, misappropriation of federal grants, and preferential treatment.  Properties like 205 Stricker Street became casualties in DHCD's ongoing pattern of corruption.

62.     On information and belief, DHCD inspectors visited 205 Stricker Street several times a year from 2010 until a few weeks before the Incident, noting the property's continuing deterioration.  Though the City knew 205 South Stricker Street was at imminent risk of collapse for years before the Incident, its failure to communicate this information to firefighters was part of a broader conscious decision to withhold information on vacant property fires.

63.     On information and belief, after the 2015 and 2016 fires, inspectors reported that 205 Stricker Street was structurally compromised and must be demolished.  These reports reached the highest levels of DHCD, which transmitted them to City divisions in charge of marking and demolishing unsafe properties and inputting data into the CAD system to warn firefighters.  However, the City never acted on these reports, never marked or demolished 205 Stricker Street, never input any information into the CAD system, and thus ignored actual notice that 205 Stricker Street and countless other condemned properties were at serious risk of collapse.  This is because the City, specifically DHCD, had another agenda.

64.     On information and belief, since at least 2017, the City withheld certain vacant properties from public tax sale due to an agreement with the Southwest Partnership ("SWP"), a non-profit community organization.  SWP would either purchase these properties for private developers through a separate bulk tax sale or recommend developers to DHCD.  SWP would either purchase those properties on behalf of private developers through a separate bulk tax sale or recommend to DHCD which developers should receive the tax sale certificates (the "Scheme").  SWP cultivated a list of "preferred developers" by charging applicants a fee, and SWP also received from those developers a percentage of their upside after they redeveloped those properties.  SWP would pay at least some of the fees it collected to DHCD under a grant agreement executed by the DHCD Commissioner.  At least some of the fees SWP paid to DHCD were likely

kept for personal gain and not deposited into the City's coffers as they are absent from DHCD's ledger for the relevant time.

65.     On information and belief, DHCD and SWP earmarked for inclusion in the Scheme vacant properties in some of the most impoverished neighborhoods provided the property was not marked or designated under the Code X-Ray program; the potential liability those properties carried made them unattractive to potential investors, so they were excluded from the Scheme.

66.     On information and belief, DHCD and the City deliberately did not mark or register dozens, perhaps hundreds, of vacant properties under the Code X-Ray program because those properties were included in the Scheme.  This included properties that had previously caught fire multiple times, were vacant for more than five (and in many cases ten) years, and which the City should have long since demolished because they were structurally compromised and at serious risk of collapse.

67.     However, it appears that no developer successfully renovated any property acquired under the Scheme.  Thus, on information and belief, the Scheme ensured revenue for SWP and DHCD without selling or rehabilitating the vacant properties—those properties were left to decay and rot, unmarked and unregistered, as actual death traps hiding in plain sight.

68.     On information and belief, 205 Stricker Street was among the properties included in the Scheme, which is why it was removed from nearly every public tax sale after it was condemned in 2015, and from the list of vacant properties slated for demolition.  Thus, the City ensured that 205 Stricker Street would never change hands and would remain a crumbling hazard waiting to collapse the next time it caught fire.

69.     On information and belief, City employees purposely avoided the 200 Block of South Stricker Street when placing Code X-Ray placards and compiling the structurally unsafe property database on direct orders from DHCD supervisors.

70.     On information and belief, even after the Scheme was uncovered in 2020, the previous orders from DHCD supervisors to not mark or register certain structurally compromised properties stayed in effect (or at least not officially rescinded), causing countless vacant properties, including 205 Stricker Street, to remain standing, unmarked, and unregistered.

### 205 S. STRICKER ST. – TIMELINE OF KEY EVENTS

| | |
|---|---|
| **2008** | Occupants move out. |
| **May 5, 2010** | The City declares 205 South Stricker vacant and requires the owners to (1) clean up and secure the property within five days, and (2) rehabilitate or demolish the building within 30 days. If owners fail to comply, then City can secure or demolish. |
| **Dec. 2010** | The City begins the Code X-Ray program and tells firefighters that the program will prevent them from ever unknowingly entering compromised structures. |
| **Apr. 2011** | The City quietly discontinues Code X-Ray but maintains with firefighters that it still exists. |
| **Nov. 12, 2014** | A Baltimore fire lieutenant dies after the floor in a vacant home collapses under him. NIOSH finds numerous violations and concludes that a marking system could have avoided the tragedy. The City promises firefighters to improve Code X-Ray as directed by NIOSH but does nothing. |
| **Mid-2015** | OSHA updates standards and advises the City to mark and register the "unexpected hazard" posed by structurally unsafe homes so firefighters do not enter. |
| **Oct. 28, 2015** | A fire at 205 South Stricker creates a hole in the roof, causes a partial collapse and a Mayday call, and injures at least three firefighters.<br><br>The City condemns the property because of major structural damage. |

| | |
|---|---|
| **March 21, 2016** | 205 South Stricker catches fire again and further destabilizes. |
| **June 2017** | The City appoints a new housing commissioner who was previously the director of code enforcement and the deputy commissioner. |
| **July 2017–July 2020** | The City engages in a pay-to-play and profit-sharing Scheme with Southwest Partnership, removing vacant and condemned homes from annual public tax sale and offering them to developers for a fee. |
| **Mid-2018** | USFA updates standards and confirms that structurally compromised properties like 205 Stricker have "no value that justifies the level of risk associated with an interior offensive operation." |
| **Aug. 2020** | City fires housing commissioner but refuses to explain the reason (i.e. for his role in the pay-to-play Scheme). |
| **June 2021** | OIG publishes its report detailing the pay-to-play scheme and highlighting that unauthorized fees were paid to the City over many years. |
| **July 2021–Jan 2022** | Remnant orders from the Scheme not to mark, demolish, or register countless properties, including 205 Stricker, remain in effect. |
| **Fall 2021** | BFD staffing reaches a "critically low level," and the City fears it cannot attract or retain competent firefighters. |
| **Jan. 24, 2022** | The Incident occurs killing Butrim, Lacayo, and Sadler, and permanently injuring McMaster. |
| **Apr. 25, 2022** | The City admits Code X-Ray was never implemented, and demands that a marking and cataloging program begin immediately so firefighters can "identify dangerous vacant homes and buildings before entering." |
| **Oct. 25, 2022** | The City officially reinstitutes the Code X-Ray program. |
| **Dec. 2, 2022** | BOI releases the Line of Duty Death Report, and the Fire Chief resigns. BOI concludes: "There was no program or policy in effect that addressed notification to [firefighters] of dwellings which were vacant and unsafe" and "The absence of critical building information and the lack of a visual cue on the building was detrimental to the outcome of this fire." |

The City admits it should not have taken seven years (since NIOSH directive after 2014 firefighter death) to implement a marking system and database, causing firefighters to be "left in the dark" for a decade.

**Oct. 31, 2023**     The City issues a directive prohibiting firefighters from interior operations at "well-involved" fires in vacant and occupied structures until, *inter alia*, the on-site Chief confirms (through marking system and/or database) the structure is safe for interior operations.

<u>**THE INCIDENT**</u>

71.     At 5:51 a.m. on January 24, 2022, Baltimore 911 began receiving calls of a fire at 205 South Stricker Street and dispatched firefighters from the Third Battalion including Plaintiffs. Engine 14 arrived on the scene four minutes later and found the property fully engulfed in flames. There were no markings or placards indicating that the structure was compromised.  So, six firefighters were ordered into the burning rowhome.

72.     Between 5:57 a.m. and 5:58 a.m., Lacayo, Sadler, Butrim, and McMaster, in that order, entered the burning home through the front door, and two firefighters from Engine 36 followed them.

73.     At 6:00 a.m., the interior collapsed trapping all six firefighters, and the Incident Commander reported a "Mayday" activating the rescue team.

74.     The two firefighters from Engine 36 were quickly removed with no injuries.

75.     The rescue team located McMaster pinned under burning debris, and removed him from the building at 6:14 a.m.  McMaster suffered numerous injuries including a severe concussion and burns across most of his body.

76.     Lacayo, Sadler, and Butrim remained trapped.  The rescue team freed and removed Lacayo at 7:39 a.m., but he died from his injuries.

77.     Sadler, who had been trapped beneath Lacayo, was finally removed from the house at 8:18 a.m., but she died from her injuries.

78.     Butrim was not found until 12:06 p.m., and it took the rescue team another four hours to remove him.  The rescue team finally removed Butrim at 4:08 p.m., more than ten hours after the collapse, and Butrim also died from his injuries.

79.     After the Incident, the Baltimore Sun reported:

[R]ecord-keeping under Code X-ray and the broader logging of fires in Baltimore's vacant properties has been haphazard over the last decade.  City legal officials provided largely undated and incomplete records of the tagging program to The Baltimore Sun, and they said the city doesn't tally fires in vacants.  City fire unions say Baltimore has a way to report details of fires' locations to a national program, which could help track such fires.

Fire commanders have been vague about how often CAD is manually updated with information about hazards.  Asked at a news conference in the wake of the Stricker Street fire if the system was regularly updated, Fire Chief Niles Ford said: "It should be."  During a recent City Council meeting, Deputy Fire Chief Charles Svehla offered: "I can't give you the exact number of times that they do it.  It's a dynamic situation."

80.     On September 13, 2022, BOI issued its Line of Duty Death Report, which is attached as **EXHIBIT 1** and incorporated herein.  The BOI report was publicly released on December 2, 2022, and the Fire Chief resigned that same day.

81.     Shortly after the Incident, Mayor Brandon Scott admitted, "There were many things that should have been tracked in the city for many, many years that weren't being tracked."

82.     The Line of Duty Death Report concluded, *inter alia*, "There was no program or policy in effect that addressed notification to members [of the Fire Department] of dwellings which were vacant and unsafe," and, "The absence of critical building information to responding units and the lack of a visual que [*sic*] on the building was detrimental to the outcome of this fire."

83.     The BOI instructed the City—for the third time in eight years—to "[e]nsure that all vacant buildings that members encounter are identified, reported, and marked," and that "premise [sic] files in the [CAD] program have information of buildings that meet the criteria for 'Unsafe Buildings' and previous fires and be relayed to companies during dispatch."

84.     Mayor Scott commented on the deaths of Lacayo, Sadler, and Butrim: "There are no words or actions that will fill the void or ease the pain felt by the family, loved ones, and colleagues of these three heroes who made the ultimate sacrifice while serving the people of Baltimore."  Mayor Scott is right.  However, some basic accountability for the City's pattern of unconstitutional conduct is a good place to start, which is what this lawsuit seeks to address.

85.     On October 25, 2022, the City formally restarted the Code X-Ray Program—twelve years after its founding, eleven years since its quiet discontinuance, and ten months *after* the Incident.

86.     On October 31, 2023, the City issued a directive that it should have issued more than a decade earlier.  The directive prohibits firefighters from interior operations at "well-involved" fires in vacant and occupied structures until certain checks have been performed and the structure is deemed safe enough by the Battalion Chief for interior firefighting (to be confirmed, *inter alia*, by exterior marking and database/CAD review).

### COUNT ONE – 42 U.S.C. § 1983
#### (*Monell* – State Created Danger)

87.     Plaintiffs incorporate the previous Paragraphs as if fully set forth herein.

88.     As described herein, the City violated the Plaintiffs' clearly established right to life, bodily integrity, and due process under the law with full appreciation of its actions at all relevant times.

89.     On information and belief, since at least 2010, the City has maintained a policy, custom, and/or practice of lying to firefighters including Plaintiffs about the existence and/or implementation of the Code X-Ray program.  Over that time, the City also engaged in a pay-to-play profit-sharing scheme involving vacant homes that the City controlled, ensuring that certain unsafe properties (including 205 Stricker Street) in certain blighted neighborhoods would not be demolished or marked as structurally compromised.

90.     Yet, on information and belief, the City continued knowingly sending its firefighters including Plaintiffs into structurally compromised homes without their knowledge.  In so doing, the City created and increased the risk of death for the Plaintiffs through its affirmative acts, willfully flouting federal law designed to protect life and limb while firefighters were killed and injured.

91.     The City chose corruption over the Constitution and revenue over individual rights at all relevant times.

92.     Consequently, firefighters including Plaintiffs were placed at imminent risk of death because of hazards the City created and concealed.

93.     The City's persistent and willful constitutional violations caused at least four firefighter deaths, countless firefighter injuries, and untold property damage.

94.     The City intended to harm firefighters including Plaintiffs through its egregious affirmative acts as described herein.

95.     The degree of the City's culpability over time, through its pattern of affirmative acts, under a policy, custom, and/or practice is egregious and shocks the conscience.

96.     The City's unconstitutional policy, custom, and/or practice harmed the Plaintiffs, as described herein.

97.     The City's unconstitutional policy, custom, and/or practice was so persistent, widespread, and well-settled that it constituted custom or usage with the force of law.

98.     The City deliberately conceived, implemented, and perpetuated the unconstitutional policy, custom, and/or practice, despite knowing that doing so placed firefighters including the (unknowing) Plaintiffs at imminent risk of death.

99.     The City's conduct described herein was arbitrary because no rational governmental purpose justified its unconstitutional policy, custom, and/or practice.

100.    Plaintiffs expressly reserve the right to amend this Complaint with additional causes of action based on (the probable) information learned in discovery.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against the City in an amount greater than Seventy-Five Thousand Dollars (>$75,000.00), attorneys' fees under 42 U.S.C. § 1988, costs, and such other and further relief as the Court deems appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs request that all claims alleged herein be tried before a jury.

Respectfully submitted,

**FURMAN | HONICK LAW**

Dated: ___May 1, 2024___

_____
**Allen E. Honick, Esquire, #19822**
**Dustin C. Furman, #19986**
11155 Red Run Boulevard, Suite 110
Owings Mills, Maryland 21117
(410) 844-6000 - Office
allen@fhjustice.com
dustin@fhjustice.com
*Counsel for Plaintiffs*


___/s/ Kevin Stern___                                    ___/s/ Kenneth Berman___
**Kevin Stern, #29869**                             **Kenneth Berman, #08529**
**Daniel Miller, #29862**                           BERMAN, SOBIN, GROSS, LLP
MILLER STERN LAWYERS, LLC               481 N. Frederick Avenue, Suite 300
2800 Quarry Lake Drive, Suite 280      Gaithersburg, MD 20877
Baltimore, MD 21209                             Telephone: (301) 670-7030
Telephone: (410) 529-3476                   Facsimile: (301) 670-9492
Facsimile: (410) 529-2450                    kberman@bsglaw.com
dan@millersternlawyers.com               *Counsel for Plaintiffs*
kevin@millersternlawyers.com
*Counsel for Plaintiffs*