IN THE UNITED STATES DISTRICT COURT
<u>FOR THE DISTRICT OF MARYLAND</u>

|  |  |  |
|---|---|---|
| **RACHEL BUTRIM,** *et al.*, | * | |
| | * | |
| | * | |
| **Plaintiffs** | * | |
| | * | **Civ. No. MJM-24-1284** |
| **v.** | * | |
| | * | |
| **MAYOR AND CITY COUNCIL** | * | |
| **OF BALTIMORE,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OPINION**</u>

Plaintiffs brought this civil action under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 438 U.S. 658, 690 (1978), against the Mayor and City Council of Baltimore (the "City" or "Defendant") alleging violations of the United States Constitution. This matter is before the Court on the Defendant's Motion to Dismiss (the "Motion"). ECF No. 12. The Motion is fully briefed and ripe for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall grant Defendant's Motion to Dismiss.

**I.      BACKGROUND**

**A.  Factual Background**

The following facts are drawn from the Complaint (ECF No. 1).

On the morning of January 24, 2022, firefighters from the Third Battalion of the Baltimore City Fire Department responded to a fire at 205 South Stricker Street (the "Property"), a condemned rowhome in the Mount Clare neighborhood of Baltimore, Maryland. Compl. ¶ 11. Six

firefighters were ordered to enter the structure, and the house collapsed moments later. *Id.* There were no markings or placards placed outside the Property indicating that it was structurally compromised. *Id.* After the collapse, a rescue team removed two firefighters from the home; three of the others—Paul Butrim, Kelsey Sadler, and Kenneth Lacayo—died; and the sixth firefighter— John McMaster—sustained serious permanent injuries. *Id.* ¶¶ 71–86.

Plaintiffs are Rachel Butrim, individually as the surviving spouse and as Personal Representative of the Estate of Paul Butrim; Paisley Butrim, individually as the surviving daughter of Paul Butrim; Lacey Marino, as Personal Representative of the Estate of Kelsey Sadler; Brandon Sadler, individually as the surviving spouse of Kelsey Sadler; Jerry Norman, individually as the surviving father of Kelsey Sadler; Gloria Lacayo, individually as surviving mother and as Personal Representative of the Estate Kenneth Lacayo; and John McMaster. (Paul Butrim, Kelsey Sadler, Kenneth Lacayo, and John McMaster are referred to herein as "Plaintiff Firefighters").

Unbeknownst to Plaintiffs, the Property was structurally unsound at the time of the fire. *Id.* ¶ 13. It had been vacant for 14 years. *Id.* Two fires had damaged the Property in 2015 and 2016, causing a partial collapse of the interior, and, in 2015, trapping and injuring three other firefighters. *Id.* The City had condemned the Property after determining that it was severely compromised and at risk of collapse. *Id.* Neighbors repeatedly complained to the City about the safety and structural integrity of the Property, but the City took no action to mitigate the risk. *Id.* ¶ 53.

The Complaint details various federal safety requirements that apply to vacant and/or structurally compromised buildings, including instructions that fire departments "implement a marking system to warn unsuspecting firefighters not to enter [compromised] properties," and that information about compromised properties be stored in a database and relayed to responding units during dispatch. *Id.* ¶¶ 25–27. According to the U.S. Fire Administration ("USFA"), marking

structurally compromised condemned properties is the most effective tool to prevent firefighter deaths. *Id.* ¶ 27. Further, the National Institute for Occupational Safety and Health ("NIOSH") has concluded that "almost every firefighter death caused by an unsafe vacant property collapse could have been avoided with an adequate marking system." *Id.*

Plaintiffs allege on information and belief that in 2010, "to comply with federal regulators and industry standards," the City implemented a program called Code X-Ray to ensure that firefighters would never be ordered into a structurally unsafe condemned property. *Id.* ¶ 28. Under Code X-Ray, the City marked structurally unsafe buildings with reflective placards or a painted red X, warning firefighters not to enter. *Id.* Plaintiffs allege that the City promised its firefighters, including Plaintiff Firefighters, that it would maintain a database of all unsafe condemned structures under Code X-Ray, syncing that database to the computer-aided fire dispatch system ("CAD"). *Id.* ¶ 29. The CAD was meant to warn responding units and provide specific property details to guide risk assessment and firefighting techniques. *Id.* The database and CAD warning system were meant to act as a failsafe if a structurally compromised building was not marked by Code X-Ray. *Id.* Code X-Ray was implemented to mitigate risk to firefighters and to comply with new workplace safety regulations and duties under federal law. *Id.* ¶ 30. The program was necessary for the City to secure and maintain grants for municipal services as new federal funding was "increasingly conditioned on adequate safety and mitigation strategies for vacant and condemned properties." *Id.*

However, shortly after starting Code X-Ray, the City discontinued the program or limited its application to a few, select neighborhoods. *Id.* ¶ 32. The City deliberately withheld this information from its Third Battalion firefighters, including Plaintiff Firefighters, who mistakenly believed, based on the City's repeated promise, that they would never be sent into a structurally

3

unsafe condemned building. *Id.* Plaintiffs allege that the City maintained a policy of knowingly and deliberately sending unsuspecting firefighters into structurally unsafe condemned buildings, while simultaneously telling firefighters that Code X-Ray would prevent this risk. *Id.* ¶ 33. "On information and belief," the Complaint alleges that Plaintiff Firefighters, and other firefighters, relied on the City's repeated assurances, "and therefore understood, as a material term of their municipal employment, that they would not be ordered into structurally unsafe condemned buildings." *Id.* ¶ 34.

Plaintiffs allege that the City maintained this policy of deception for more than ten years before the incident at issue here, and as a result of this policy, at least one other Baltimore firefighter was killed in 2014 and three others injured in 2015. *Id.* ¶¶ 36–37. After the 2014 death, NIOSH "explicitly told the City to begin marking unsafe vacant properties to avoid another tragedy." *Id.* ¶ 37. Plaintiffs allege that the City never corrected these deficiencies and instead, continued lying to firefighters about the existence of Code X-Ray and, therefore, material terms of their employment. *Id.* ¶ 38.

Between 2014 and 2018, the Occupational Safety and Health Administration ("OSHA"), USFA, and the National Fire Protection Association ("NFPA") updated their standards and advised municipalities, including the City, to place exterior signs on structurally compromised buildings. *Id.* ¶¶ 39–41. After the incident at issue here, NIOSH found that the City violated numerous USFA standards and NFPA directives. *Id.* ¶ 41. Plaintiffs allege that the City was deliberately indifferent when it intentionally disregarded the risk it created and intentionally exposed Plaintiffs to that risk. *Id.* ¶¶ 43–44. The Board of Inquiry ("BOI") Line of Duty Death Report concluded, in relevant part, "There was no program or policy in effect that addressed notification to [firefighters] of dwellings which were vacant and unsafe," and "The absence of critical building information and

4

the lack of a visual cue on the building was detrimental to the outcome of this fire." *Id.* ¶ 55. Therefore, Plaintiffs contend, the BOI "confirmed that the City fabricated the existence and/or the implementation of the Code X-Ray program, purposely misleading firefighters . . . since 2010." *Id.* ¶ 56.

Plaintiffs allege on information and belief that, after the 2015 and 2016 fires at the Property, inspectors reported that the Property was structurally compromised and needed to be demolished, but the City never acted on the reports and, therefore, ignored actual notice that the Property was at serious risk of collapse. *Id.* ¶ 63. The City never marked or demolished the Property and never input the relevant information into the CAD system. *Id.* Plaintiffs allege that the City failed to act because it was withholding certain vacant properties in impoverished neighborhoods from public tax sale due to an agreement with the Southwest Partnership ("the Partnership"), a nonprofit community organization. *Id.* ¶¶ 63–64. The Partnership would purchase these properties through a separate bulk tax sale or recommend developers to the City. *Id.* ¶ 64. These properties were not marked in accordance with Code X-Ray because being marked made the properties unattractive to potential investors. *Id.* ¶¶ 64–65, 68. The scheme ensured revenue for the Partnership and the City, while leaving vacant properties, like the Property, to further degenerate without warning to firefighters. *Id.* ¶ 67.

**B.  Procedural Background**

On May 1, 2024, Plaintiffs filed their Complaint against Defendant alleging *Monell* liability for an unconstitutional state-created danger under 42 U.S.C. § 1983. ECF No. 1. Defendant filed a Motion to Dismiss arguing that the Complaint fails to state a claim for relief. ECF No. 12. Plaintiffs responded in opposition to the Motion, ECF No. 17, and Defendant replied, ECF No. 18.

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). "In alleging fraud or mistake," however, Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013) (citation omitted). "The standard set forth by Rule 9(b) aims to provide defendants with fair notice of claims against them and the factual ground upon which they are based, forestall frivolous suits, prevent fraud actions in which all the facts are learned only following discovery, and protect defendants' goodwill and reputation." *Id.* (citation omitted).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not include "detailed factual allegations" to satisfy Rule 8(a)(2), but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is

very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Furthermore, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* "[T]ender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (third alteration in *Iqbal*).

When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to the remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert denied*, 566 U.S. 937 (2012).

## III.    DISCUSSION

Plaintiffs assert a *Monell* claim under 42 U.S.C. § 1983 alleging that Defendant subjected Plaintiff Firefighters to a state-created danger in violation of their due process rights under the Fourteenth Amendment. Defendant argues that the Complaint must be dismissed because under

the limited state created danger doctrine in the voluntary employment context, Plaintiffs cannot show that Defendant intended to harm its employees. For reasons explained below, the Court finds that the Complaint fails to allege a plausible state-created danger in violation of the Due Process Clause. The Complaint will, therefore, be dismissed without prejudice.

**A.  Substantive Due Process and the State-Created Danger Doctrine**

Title 42, United States Code, Section 1983 provides a right of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Thus, to sustain an action under § 1983, a plaintiff must demonstrate that: (1) he suffered a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 45 n.3 (1988). "[A] viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Green v. Obsu*, Civ. No. ELH-19-2068, 2020 WL 758141, at *10 (D. Md. Feb. 13, 2020) (citations omitted).

The provision in the Fourteenth Amendment to the United States Constitution that "'[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law' . . . 'guarante[es] more than fair process[.]" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (citations omitted). Substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them[.]" *Id.* (citation omitted). The U.S. Supreme Court has explained that the concept of due process, at its core, is protection against arbitrary

governmental action. *See id.* at 845; *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). In cases involving "abusive executive action[,]" the Court has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). To establish a substantive due process violation based on executive action, the challenged conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (citation omitted); *see also Waybright v. Frederick Cnty., Md.*, 528 F.3d 199, 205 (4th Cir. 2008) ("[T]he Supreme Court has, for half a century now, marked out executive conduct wrong enough to register on a due process scale as conduct that 'shocks the conscience,' and nothing less.") (quoting *Lewis*, 523 U.S. at 846). "To be conscience shocking, a defendant's behavior must lack any reasonable justification in the service of a legitimate governmental objective.'" *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023) (quoting *Lewis*, 523 U.S. at 846).

Whether a government actor's conduct "shocks the conscience" turns on its degree of culpability. *Waybright*, 528 F.3d at 205; *see also Lewis*, 523 U.S. at 847 ("While the measure of what is conscience shocking is no calibrated yard stick, it does . . . 'poin[t] the way.'") (citation omitted). "For a due process challenge to executive action to succeed, the general rule is that the action must have been 'intended to injure in some way unjustifiable by any government interest.'" *Waybright*, 528 F.3d at 205 (quoting *Lewis*, 523 U.S. at 849). At the other end of the "culpability spectrum" lies "negligently inflicted harm," which is "categorically beneath the threshold of constitutional due process." *Id.* (quoting *Lewis*, 523 U.S. at 848–49). "'[C]ulpability falling within the middle range" between intentionally and negligently inflicted harm "may have constitutional implications, but only in special circumstances." *Id.* (quoting *Lewis*, 523 U.S. at

849). Courts evaluating due process claims grounded in this middle range of the culpability spectrum "should proceed with 'self-restraint' and 'utmost care,' . . . and make 'an exact analysis' of the circumstances presented 'before any abuse of power is condemned as conscience shocking[.]'" *Id.* (quoting *Collins*, 503 U.S. at 125, and *Lewis*, 523 U.S. at 850).

In *Collins*, the Supreme Court affirmed dismissal of a § 1983 due process claim based on "the city's customar[y] fail[ure] to train or warn its employees about known hazards in the workplace[,]" which was alleged to have resulted in the death of a municipal employee. 503 U.S. at 117. The Court rejected the proposition that "the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Collins*, 503 U.S. at 126. More specifically, the Court rejected the notion "that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 128. In its analysis, the Court noted that the complaint did not charge the city with a "willful" violation of the decedent employee's rights and did not allege that the city or its agents "deliberately harmed" him. *Id.* at 125. !

As a general matter, "the Due Process Clause does not require the State to provide its citizens with particular protective services," and "the State cannot be held liable for injuries that could have been averted had it chosen to provide them." *Turner v. Thomas*, 930 F.3d 640, 645 (4th Cir. 2019) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196–97 (1989)). There are two exceptions to this rule: (1) "when the individual and the state have a 'special relationship,' such as a custodial relationship, that gives rise to an affirmative duty to protect[;]" and (2) when a state actor takes "affirmative actions" that "create[] or enhance[] the dangerous conditions[,]" resulting in injury. *Id.* (citing *DeShaney*, 489 U.S. at 199–201, and *Pinder v.*

*Johnson*, 54 F.3d 1169, 1176 (4th Cir. 1995) (en banc)). The latter exception is known as the "state-created danger" doctrine. *Id.* "[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "[T]he state-created danger doctrine is narrowly drawn, and the bar for what constitutes an 'affirmative act' is high." *Turner*, 930 F.3d at 645 (citing *Pinder*, 54 F.3d at 1175). A government actor does not "create" a danger in "simply fail[ing] to provide adequate protection from it." *Pinder*, 54 F.3d at 1175. *See also Turner*, 930 F.3d at 646 (highlighting the difference between acts and omissions and warning against recasting omissions as acts).

In *Waybright v. Frederick Cnty., Md.*, the Fourth Circuit affirmed summary judgment in favor of the municipal defendants on the plaintiffs' due process claim based upon a fire department recruit's accidental death following an intensive physical training session. 528 F.3d at 208. As relevant here, the Fourth Circuit rejected the plaintiffs' contention that Waybright was in a "special relationship" with his supervisor such that the government had "a duty to act on [Waybright's] behalf and its failures to act [were] measured on a deliberate indifference standard[.]" *Id.* at 207. The court recognized that "a 'special relationship' is all but synonymous with a custodial relationship." *Id.* (citing *DeShaney*, 489 U.S. at 199–200). "The idea of a custodial relationship is a circumscribed one, grounded in the rationale *DeShaney* gives for it: '[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action. . . .'" *Id.* (quoting *DeShaney*, 489 U.S. at 200). Therefore, for a relationship to be considered custodial for due process purposes, there must be some sort of confinement, such as incarceration or institutionalization. *Id.* (citing *Pinder*, 54 F.3d at 1175). The

special relationship doctrine did not apply because the decedent in *Waybright* was free to walk away from the training session and the job. *Id.*

Furthermore, the Fourth Circuit ruled that the state-created danger doctrine could not apply in light of the Supreme Court's holding in *Collins* that "due process does not impose a duty on municipalities to provide their employees with a safe workplace or warn them against risks of harm (though state tort law may)." *Id.* Applying the state-created danger doctrine in cases like *Waybright* would risk displacing state tort law with federal constitutional law "whenever an accident happens during activities sponsored by the state." *Id.* at 208.   The court noted "immense" practical consequences of finding a state-created danger in such cases: "[Courts] might well inject federal authority into public school playground incidents, football (or even ballet) practice sessions, and class field trips, not to mention training sessions for government jobs that require some degree of physical fitness." *Id.*

The Fourth Circuit later applied *Collins* and *Waybright* in *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317 (4th Cir. 2012). In *Slaughter*, a fire department recruit, Racheal Wilson, died during a "live burn" training exercise. 682 F.3d at 319. Her survivors and estate brought an action against the Mayor and City Council of Baltimore under § 1983 alleging that the fire department violated Wilson's substantive due process rights by staging the exercise with deliberate indifference to her safety, "so as to shock the conscience." *Id.* Specifically, the plaintiffs alleged that Wilson's death could have been avoided with "adequate preparations," but the fire department willfully violated "nationally-recognized safety standards" and "created unduly dangerous conditions in staging the exercise." *Id.* at 320.

The Fourth Circuit affirmed dismissal of the complaint for failure to state a claim. Applying *Collins* and *Waybright*, the court held that the complaint "f[ell] short of alleging a substantive due

process violation" because it "d[id] not . . . allege that the Fire Department staged the live burn training exercise *with the purpose of causing harm to Wilson or to any other recruit*[.]" *Id.* at 319. The court recognized that the allegations may have been consistent with deliberate indifference, *id.* at 322, and may have supported a cause of action under state law, *id.* at 319. "But in the voluntary employment context," the plaintiffs did not allege "arbitrary (in the constitutional sense) or conscience-shocking conduct because they did not assert that the Fire Department *intended to harm* Wilson, as would be necessary to establish a substantive due process violation." *Id.* at 322 (citing *Collins*, 503 U.S. at 125–27 & n.10, and *Lewis*, 523 U.S. at 848–49). The Fourth Circuit ultimately held, in the context of this case, that the fire department's constitutional liability "turn[ed] on whether it *intended to harm* the new recruits." *Id.* at 323.

This intent-to-harm standard has been consistently applied by district courts in the Fourth Circuit. *See Est. of Cunningham v. Mayor & City Council of Baltimore*, 665 F. Supp. 3d 725, 736– 37 (D. Md. 2023) (dismissing state-created danger claim where plaintiffs alleged that the defendants "deliberately chose not to repair or properly maintain" work environment and "deliberately chose not to train or inform" employees about safety policies, but plaintiffs did not plausibly allege an intent to harm); *Evans v. Maryland Nat'l Cap. Parks & Plan. Comm'n*, Civ. No. TDC-19-2651, 2020 WL 6703718, at *13–14 (D. Md. Nov. 13, 2020) (declining to dismiss substantive due process claim where plaintiffs plausibly alleged an intent to harm through repeated use of racial slurs, baseless and harassing investigations, unwarranted discipline, and an unjustified medical suspension). *Accord Smith v. City of Greensboro*, No. 1:19CV386, 2020 WL 1452114, at *15 (M.D.N.C. Mar. 25, 2020) ("Outside of the custodial context, government conduct normally does not shock the conscience (at least not in the constitutional sense) unless it was 'intended to injure in some way unjustifiable by any government interest'—a higher standard of fault than

deliberate indifference."); *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 734–36 (D. Md. 2013) ("'[I]n the voluntary employment context,' the employee plaintiff must show that the governmental employer defendant '*intended to harm*' its employee in order to 'establish a substantive due process violation.'") (quoting *Slaughter*, 682 F.3d at 322) (emphasis in original)). In fact, given the Fourth Circuit's consistently narrow reading of the state-created danger doctrine, that court noted in *Turner* that it has "never issued a published opinion recognizing a successful state-created danger claim." *Turner*, 930 F.3d at 646. This statement remains true today, to this Court's knowledge.

**B. Analysis**

Here, while the facts alleged in the Complaint are tragic and alarming, this Court is constrained by *Collins* and *Slaughter* to find them insufficient to state a plausible claim under § 1983 for a violation of the Due Process Clause.

The Complaint states that, on the morning of January 24, 2022, firefighters from the Third Battalion of the Baltimore City Fire Department were dispatched to respond to a fire at the Property. Compl. ¶ 11. There were no markings or placards on the Property to indicate that it was structurally compromised, as required by the Code X-Ray program and federal safety standards. *Id.* Six firefighters, including Plaintiff Firefighters, were ordered to enter the burning building. *Id.* The interior of the building then collapsed, trapping the four Plaintiff Firefighters. *Id.* McMaster suffered injuries but survived the incident, while Lacayo, Sadler, and Butrim died from their injuries. *Id.* Plaintiffs allege, largely "[o]n information and belief," that the City "engaged in a pay-to-play profit-sharing scheme involving vacant homes that the City controlled, ensuring that certain unsafe properties (including [the Property]) . . . would not be demolished or marked as structurally compromised[;]" sent firefighters, including Plaintiff Firefighters, into these

14

structurally compromised buildings without their knowledge; and knowingly maintained a policy, custom, and/or practice that "placed firefighters . . . at imminent risk of death." *Id.* ¶¶ 89, 90, 98. The foregoing facts, accepted as true for purposes of Defendant's motion and viewed in the light most favorable to Plaintiffs, do not support a reasonable inference that the City took any affirmative act with the intent to harm Plaintiff Firefighters, as required by *Collins* and *Slaughter* to allege a plausible due process violation in the employment context.

The Court is not persuaded that Plaintiffs allege sufficient facts to remove this case from the voluntary employment context governed by the Fourth Circuit's holding in *Slaughter*. Plaintiffs allege, again "[o]n information and belief," that "the City maintained a policy, custom, and/or practice of lying to firefighters . . . about the existence and/or implementation of the Code X-Ray program[;]" that the City falsely assured firefighters that the program would prevent them from being sent into "structurally unsafe condemned buildings[;]" and that firefighters, including Plaintiff Firefighters, "relied on the City's repeated assurances, and therefore understood, as a material term of their municipal employment, that they would not be ordered into structurally unsafe condemned buildings." Compl. ¶¶ 33, 34, 89. Plaintiffs claim, in essence, that Plaintiff Firefighters were fraudulently induced into an employment relationship with the City[1] and argue that the City's "misrepresentation" makes this case "unique" and unlike *Slaughter* in that it

---

[1] The elements of fraudulent inducement are as follows:

> (1) a material representation of a party was false; (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him; (3) the misrepresentation was made with the purpose to defraud (scienter); (4) the person justifiably relied on the misrepresentation; and (5) the person suffered damage directly resulting from the misrepresentation.

*Airport Square Holdings, LLC v. GCCFC 2007-GG9 Colomary Facilities, LLC*, Civ. No. JFM-16-02883, 2017 WL 639230, at *6 (D. Md. Feb. 16, 2017) (citing *Lawley v. Northam*, Civ. No. ELH-10-1074, 2011 WL 6013279, at *9 (D. Md. Dec. 1, 2011)).

undermines the voluntariness of Plaintiff Firefighters' employment. Pl. Opp'n at 15–18. Even if this Court were to accept the argument that an employment relationship founded on material misrepresentations would distinguish this case from *Slaughter*, the facts contained in the Complaint are inadequate to support a plausible claim that Plaintiff Firefighters were so fraudulently induced into employment as firefighters.

Like many of Plaintiffs' allegations of egregious conduct by the City, Plaintiffs' allegations that the City misrepresented its implementation of the Code X-Ray program and that Plaintiff Firefighters' relied on this misrepresentation are made "[o]n information and belief[.]" *See* Compl. ¶¶ 33, 34, 89. Other judges of this Court have recognized that "using 'upon information and belief' as a pleading device survives a motion to dismiss only where 'the facts are peculiarly within the possession of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible.'" *Stone v. Trump*, 400 F. Supp. 3d 317, 341 (D. Md. 2019) (quoting *Malibu Media, LLC v. Doe*, Civ. No. PWG-13-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014)). Here, whether the City directed a misrepresentation toward Plaintiff Firefighters upon which the firefighters relied as a material term of employment is not information "peculiarly within the possession of the defendant[.]" *Id.* And the Court cannot find that Plaintiffs' belief that the City misrepresented material terms of employment "is based on factual information that makes the inference of culpability plausible." *Id.*

The Complaint's factual deficiency as to the City's alleged fraudulent conduct is particularly stark in consideration of the heightened pleading standard of Rule 9(b). This Rule requires averments of fraudulent inducement to be supported by stating "with particularity the circumstances" constituting the fraud. Fed. R. Civ. P. 9(b); *see also Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 15 F.3d 327, 331 (4th Cir. 1994) (affirming dismissal of fraudulent

inducement claim for failure to plead with particularity). Rule 9(b) applies "to all averments of fraud, whether they are part of a claim of fraud or not." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001). "[I]f particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim. The court should then examine the allegations that remain to determine whether they state a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104–05 (9th Cir. 2003); *see also Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 945 (7th Cir. 2024) ("[I]f a court thinks a plaintiff has failed to plead fraud, it must 'disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.'") (quoting *Lone Star Ladies Inv. Club*, 238 F.3d at 368.

Here, the Complaint is silent as to the particular circumstances of the City's alleged misrepresentation, such as the time and place of the misrepresentation and the identity of the person who made it. *See McCauley*, 710 F.3d at 559 (citation omitted). As such, the Court must disregard Plaintiffs' allegations about the City's alleged misrepresentation and Plaintiff Firefighters' alleged reliance upon it as a material term of employment. Plaintiffs do not allege that they were coerced into employment with the City or that they were subject to confinement by the City. Setting aside Plaintiffs' unsupported averments of having been fraudulently induced into employment, *Slaughter*'s intent-to-harm standard clearly applies to Plaintiffs' state-created danger claim.[2]

---

[2] Moreover, without the factual enhancement necessary to sustain the allegation that Defendant lied to Plaintiff Firefighters, the Court cannot determine whether this case presents "special circumstances" to support a finding that Defendant's intermediate level of culpability has "constitutional implications[.]" *Waybright*, 528 F.3d at 205. *See also Washington*, 58 F.4th at 178 ("Ultimately, the applicable standard of culpability for a substantive-due-process claim—either 'intent to harm' or 'deliberate indifference'— depends on 'an exact analysis of [the] context and circumstances' of the case.") (quoting *Dean*, 976 F.3d at 414).

Although Plaintiffs allege that the City acted "deliberately" and "intended to harm firefighters . . . through its egregious affirmative acts," *id.* ¶¶ 95, 98, they fail to allege sufficient facts to support these conclusory and formulaic allegations. Plainly, Plaintiffs do not allege that the City sent Plaintiff Firefighters into the Property on January 24, 2022, with the intent to injure them. The only plausible purpose for sending Plaintiff Firefighters into the Property supported by the facts in the Complaint was to fight the fire that engulfed the building. The only facts offered that speak to the City's motivations in failing to mark the Property as structurally compromised concern the City's agreement with the Southwest Partnership, a nonprofit community organization. *See* Compl. ¶¶ 63–68. Plaintiffs allege on information and belief that this agreement caused the City to avoid marking certain compromised properties because the markings would make them unattractive to potential investors. *See id.* ¶¶ 64–65, 68. Accepting these allegations as true—and accepting that they may describe wrongful or even egregious conduct by Defendant—the Court does not find that the allegations support a reasonable inference that Defendant acted with the purpose of causing harm to Plaintiff Firefighters. *See Slaughter*, 682 F.3d at 323 (finding no constitutional liability for a state-created danger where facts in the complaint did not support the conclusion that the fire department "*intended to harm*" employees); *Cunningham*, 665 F. Supp. 3d at 737 (dismissing state-created danger claim where plaintiffs' allegations describe "negligent, or even egregious, conduct by the City Defendants" but "do not show that the City Defendants intended to harm [decedent]"). Therefore, the Complaint fails to state a plausible claim under § 1983 for a state-created danger in violation of the Due Process Clause.

Because Plaintiffs fail to allege a plausible constitutional violation, their *Monell* claim cannot survive Defendant's motion to dismiss. *See Johnson v. Baltimore Police Dep't*, 500 F. Supp. 3d 454, 459–60 (D. Md. 2020) ("[A] *Monell* claim cannot lie 'where there is no underlying

constitutional violation by the employee.'") (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001)).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss will be GRANTED. The Complaint shall be dismissed without prejudice.

A separate Order will follow.

  12/9/24
Date

Matthew J. Maddox
United States District Judge